STATE OF CONNECTICUT *v.* JEFFREY ROLLINSON
(12814)

PETERS, C. J., HEALEY, SHEA, CALLAHAN and HULL, Js.

Argued April 8—decision released June 2, 1987

*T. Stevens Bliss,* special public defender, for the appellant (defendant).

*Christopher Malany,* deputy assistant state's attorney, with whom, on the brief, were *Raymond Doyle, Jr.,* and *Linda Knight,* assistant state's attorneys, and *Alice Osedach,* legal intern, for the appellee (state).

PETERS, C. J. The principal issues on this appeal are the validity of the information charging the defendant, Jeffrey Rollinson, with having committed the crime of murder in violation of General Statutes § 53a-54a,[1] and the admissibility at his trial of inculpatory statements that he made while he was a patient in a hospital alcohol detoxification unit. The trial court, after a jury verdict of guilty as charged, sentenced the defendant to

---

[1] "[General Statutes] Sec. 53a-54a. MURDER DEFINED. AFFIRMATIVE DEFENSES. EVIDENCE OF MENTAL CONDITION. CLASSIFICATION. (a) A person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person or of a third person or causes a suicide by force, duress or deception; except that in any prosecution under this subsection, it shall be an affirmative defense that the defendant [acted] under the influence of extreme emotional disturbance for which there was a reasonable explanation or excuse, the reasonableness of which is to be determined from the viewpoint of a person in the defendant's situation under the circumstances as the defendant believed them to be, provided nothing contained in this subsection shall constitute a defense to a prosecution for, or preclude a conviction of, manslaughter in the first degree or any other crime.

"(b) Evidence that the defendant suffered from a mental disease, mental defect or other mental abnormality is admissible, in a prosecution under subsection (a), on the question of whether the defendant acted with intent to cause the death of another person.

"(c) Murder is punishable as a class A felony in accordance with subdivision (2) of section 53a-35a unless it is a capital felony."

incarceration for a term of twenty-five years. The defendant has appealed on multiple grounds. We find no error.

The jury could properly have found the following facts. On the morning of March 18, 1983, the body of Hazel Clinkard was found in the bedroom of her Bethel home. The victim had been brutally beaten and repeatedly stabbed. Near the body, the police found a blood-stained warm-up jacket worn by the assailant during the attack. This jacket belonged to the defendant, and it had been seen in the car the defendant had been driving the previous day.

During much of that previous day, March 17, the defendant had been drinking at various bars with Raymond Pannozzo and Jerry Lee Forker, both of whom lived in the victim's home. Pannozzo had told the defendant that the victim kept money in her bedroom. Pannozzo and Forker had invited the defendant to spend the night at the Clinkard home and the front door was, by agreement, left unlocked for the defendant when Pannozzo returned home alone. Pannozzo exchanged a few words with the victim in the early hours of March 18 and discovered her body later that morning.

On March 23, 1983, the defendant voluntarily admitted himself to the alcohol detoxification unit at Danbury Hospital. While there, he made a number of incriminating statements to members of the staff and to other patients. Upon his discharge, he went, in mid-April, to search a brook into which he thought he might have thrown a paring knife that might have been used in the slaying of the victim. A police scuba diver subsequently discovered such a knife in that location, and the knife was identified at trial as resembling one that was missing from the victim's home.

In this appeal from his conviction of murder, the defendant has raised ten issues that can conveniently be considered in four groupings. He maintains that the trial court erred: (1) in sustaining the validity of the information by which he was charged; (2) in two evidentiary rulings permitting the jury to hear incriminatory and prejudicial statements; (3) in improperly instructing the jury on reasonable doubt, motive and intent; and (4) in denying his posttrial motion for acquittal. We find no reversible error with regard to any of the defendant's claims.

I

The defendant has launched a twofold attack on the validity of the information by which he was charged with the crime of murder. Each of these claims of invalidity arises out of the 1983 enactment of General Statutes § 54-46a.[2] This statute was enacted to implement

[2] "[General Statutes] Sec. 54-46a. PROBABLE CAUSE HEARING FOR PERSONS CHARGED WITH CRIMES PUNISHABLE BY DEATH OR LIFE IMPRISONMENT. (a) No person charged by the state on or after May 26, 1983, shall be put to plea or held to trial for any crime punishable by death or life imprisonment unless the court at a preliminary hearing determines there is probable cause to believe that the offense charged has been committed and that the accused person has committed it. The accused person may knowingly and voluntarily waive such preliminary hearing to determine probable cause.

"(b) Unless waived by the accused person or extended by the court for good cause shown, such preliminary hearing shall be conducted within sixty days of the filing of the complaint or information in superior court. The court shall be confined to the rules of evidence, except that written reports of expert witnesses shall be admissible in evidence and matters involving chain of custody shall be exempt from such rules. No motion to suppress or for discovery shall be allowed in connection with such hearing. The accused person shall have the right to counsel and may attend and, either individually or by counsel, participate in such hearing, present argument to the court, cross-examine witnesses against him and obtain a transcript of the proceedings at his own expense. At the close of the prosecution's case, if the court finds that, based on the evidence presented by the prosecution, probable cause exists, the accused person may make a specific offer of proof, including the names of witnesses who would testify or produce the evidence offered. The court shall not allow the accused person to present

the provisions of article XVII of the amendments to the Connecticut constitution, which substituted a probable cause hearing for the grand jury indictment formerly required before a person could be held to answer for a crime punishable by death or life imprisonment. Conn. Const., amend. XVII.[3] The defendant maintains that: (1) § 54-46a cannot be applied in his case without violating the prohibition against ex post facto laws contained in article one, § 10, of the United States constitution;[4] and (2) § 54-46a cannot be applied in any case

such evidence unless the court determines that such evidence would be sufficient to rebut the finding of probable cause.

"(c) If, from the evidence presented pursuant to subsection (b) of this section, it appears to the court that there is probable cause to believe that the accused person has committed the offense charged, the court shall so find and approve the continuance of the accused person's prosecution for that offense. A determination by the court that there is not probable cause to require the accused person to be put to trial for the offense charged shall not operate to prevent a subsequent prosecution of such accused person for the same offense."

[3] Article XVII of the amendments to the Connecticut constitution provides:

"Section 8 of article first of the constitution is amended to read as follows:

"In all criminal prosecutions, the accused shall have a right to be heard by himself and by counsel; to be informed of the nature and cause of the accusation; to be confronted by the witnesses against him; to have compulsory process to obtain witnesses in his behalf; to be released on bail upon sufficient security, except in capital offenses, where the proof is evidence or the presumption great; and in all prosecutions by information, to a speedy, public trial by an impartial jury. No person shall be compelled to give evidence against himself, nor be deprived of life, liberty or property without due process of law, nor shall excessive bail be required nor excessive fines imposed. No person shall be held to answer for any crime, punishable by death or life imprisonment, unless upon probable cause shown at a hearing in accordance with procedures prescribed by law, except in the armed forces, or in the militia when in actual service in time of war or public danger."

[4] Article one, § 10, clause 1, of the United States constitution provides: "No State shall enter into any Treaty, Alliance, or Confederation; grant Letters of Marque and Reprisal; coin Money; emit Bills of Credit; make any Thing but gold and silver Coin a Tender in Payment of Debts; pass any Bill of Attainder, ex post facto Law, or Law impairing the Obligation of Contracts, or grant any Title of Nobility."

without violating the prohibition against the separation of powers contained in article second of the Connecticut constitution.[5] These claims must be addressed separately.

## A

The rules of law that underlie the defendant's claim under the United States constitution are well established. The prohibition of ex post facto laws forbids the enactment of "any law 'which imposes a punishment for an act which was not punishable at the time it was committed; or imposes additional punishment to that then prescribed.' *Cummings* v. *Missouri,* 4 Wall. 277, 325–26, 18 L. Ed. 356 (1867)." *Weaver* v. *Graham,* 450 U.S. 24, 28, 101 S. Ct. 960, 67 L. Ed. 2d 17 (1981); see also W. LaFave & A. Scott, Criminal Law (1972) § 12; 2 R. Rotunda, J. Nowak & J. Young, Treatise on Constitutional Law: Substance and Procedure (1986) § 15.9 (b); L. Tribe, American Constitutional Law (1978) §§ 10-2, 10-3. Under the applicable federal cases, "two critical elements must be present for a criminal or penal law to be *ex post facto*: it must be retrospective, that is, it must apply to events occurring before its enactment, and it must disadvantage the offender affected by it." (Emphasis in original.) *Weaver* v. *Graham,* supra, 29.

Retroactivity, the first of these elements, is not an issue in this case. The crime of murder that the defendant was alleged to have committed occurred on March 18, 1983. Although the constitutional amendment abolishing the indicting grand jury had been approved by the voters the previous fall, § 54-46a, the statute that was required to implement that amendment, did not take

[5] Article second of the Connecticut constitution provides: "The powers of government shall be divided into three distinct departments, and each of them confided to a separate magistracy, to wit, those which are legislative, to one; those which are executive, to another; and those which are judicial, to another."

effect until May 26, 1983. Section 54-46a repealed the prior statutory provision for grand jury indictments contained in General Statutes § 54-45 and prescribed the procedures by which probable cause hearings would be conducted. We held, in *State* v. *Sanabria,* 192 Conn. 671, 691, 474 A.2d 760 (1984), that "that portion of the [constitutional] amendment establishing probable cause hearings did not take effect until the enabling legislation took effect on May 26, 1983." On its effective date, "*all* persons then being held for crimes punishable by death or life imprisonment, who had not yet been indicted by grand jury became entitled to a probable cause hearing before their cases went to trial, regardless of the dates on which they were arrested or charged by information." (Emphasis in original.) Id., 699. The defendant was charged with murder on July 13, 1984, and was, on September 6, 1984, afforded a hearing in probable cause pursuant to § 54-46a. It is therefore undisputed that, although the defendant was charged with the commission of a crime that antedated the effective date of § 54-46a, his prosecution has been governed retrospectively by the new procedures mandated by that statute.

The crucial question is that posed by the second element of the ex post facto test: does the substitution of a probable cause hearing for a grand jury indictment unconstitutionally "disadvantage the offender affected by it?"[6] The defendant maintains that this question

---

[6] It is arguable that the changes brought about by the enactment of General Statutes § 54-46a are essentially procedural in nature and hence fall outside of the constitutional prohibition of ex post facto laws. *Dobbert* v. *Florida,* 432 U.S. 282, 294, 97 S. Ct. 2290, 53 L. Ed. 2d 344 (1977). We have, however, expressly held that the statutory procedures established by § 54-46a are "constituent parts" of the substantive rights created by the adoption of amendment seventeen to article first, § 8, of the Connecticut constitution. *State* v. *Sanabria,* 192 Conn. 671, 690, 474 A.2d 760 (1984). We will assume, for the purposes of the present case, that the reforms implemented by § 54-46a are not purely procedural.

should be answered in the affirmative because of several salient differences between grand jury proceedings and probable cause hearings: (1) the vesting of decision-making authority in a grand jury consisting of peer group representatives of the community at large in contrast to the determination of probable cause by a single judge; (2) the absence of counsel for the state, and for the defendant, at grand jury proceedings, in contrast to their affirmative role in probable cause hearings; (3) the grand jury's discretion to gather information without regard to the formal rules of evidence, in contrast to the evidentiary rules that govern probable cause hearings; and (4) the confidentiality afforded by a grand jury proceeding, in contrast to the public nature of a probable cause hearing. The defendant argues that these distinctions present significant disadvantages that are not offset by his right, at his probable cause hearing, to have counsel present, to be informed of the basis of the charge against him and to present rebuttal evidence. We are unpersuaded.

The changes embodied in amendment seventeen to article first, § 8, of the Connecticut constitution, as implemented by § 54-46a, represent the collective judgment of the legislature and of the voters that indicting grand juries did not provide adequate safeguards for those accused of having committed serious crimes. As we noted in *State* v. *Mitchell,* 200 Conn. 323, 326–27, 512 A.2d 140 (1986), "[a]lthough originally conceived as a shielding device to protect individuals from unfounded prosecutions; *State* v. *Menillo,* 159 Conn. 264, 275, 268 A.2d 667 (1970); the grand jury system came to be widely criticized for its secret operation and its ex parte nature. See Spinella, Conn. Crim. Proc. (1985) pp. 272–73; Berdon, 'Connecticut Grand Juries: The Case for Reform,' 54 Conn. B.J. 8, 9–16 (1980); Goldstein, 'The State and the Accused: Balance of Advantage in Criminal Procedure,' 69 Yale L.J. 1165, 1171 (1960)."

The grand jury system precluded the accused person from effective participation in its processes and precluded judicial review of the evidentiary basis of any indictment that the grand jury might return. *State* v. *Mitchell,* supra, 327, and cases there cited. These defects in the grand jury system do not become virtues simply because the defendant has labeled them as such. The advantages of an adversarial evidentiary hearing, with the assistance of counsel, are similarly not to be deprecated just because a hearing in probable cause is necessarily more limited in scope than a full trial on the merits. A defendant against whom a grand jury returns a true bill is afforded no more privacy than a defendant who is held for trial after a hearing in probable cause. For all of these reasons, the substitution of a fair and open hearing by a judge familiar with the legal requirements of probable cause does not place an accused in a position more disadvantageous than that offered by a secret indictment returned by a jury of his peers.

The prohibition against ex post facto laws does not interdict the retrospective application of every change in the laws governing the criminal justice system. We have found no constitutional impediment in changes in the number of peremptory challenges available to the state; *State* v. *Hoyt,* 47 Conn. 518, 532–33 (1880); or in the number of persons composing a jury. *State* v. *Maresca,* 173 Conn. 450, 451–54, 377 A.2d 1330 (1977). We conclude that the change from indictment to information similarly did not so disadvantage the defendant as to require the dismissal of the charges against him. Accord *Hubbard* v. *State,* 411 So. 2d 1312, 1313 (Fla. App. 1981); *People* v. *Tibbs,* 46 Ill. App. 3d 310, 311–12, 360 N.E.2d 993 (1977); *State* v. *Sepulvado,* 342 So. 2d 630, 635–36 (La. 1977); *State* v. *Kyle,* 166 Mo. 287, 303–306, 65 S.W. 763 (1901); *People ex rel. Pincus* v. *Adams,* 274 N.Y. 447, 454–57, 9 N.E.2d 46

(1937); *Wells* v. *Maxwell,* 174 Ohio St. 198, 200, 188 N.E.2d 160 (1963); *Lybarger* v. *State,* 2 Wash. 552, 554–61, 27 P. 449 (1891); contra *Putty* v. *United States,* 220 F.2d 473, 476–77 (9th Cir. 1955).

## B

The defendant's alternate attack on the validity of the information by which he was charged rests on a premise derived from state constitutional law. He maintains that the legislative enactment of § 54-46a is an unconstitutional encroachment on the powers assigned to the judiciary by virtue of the separation of powers provisions of our state constitution. Conn. Const., arts. II and V, § 1.[7] This argument is based on the fact that it was not until October 1, 1984, a date subsequent to the defendant's probable cause hearing, that our rules of practice were amended to delete rules for indicting grand juries and to insert rules to govern hearings in probable cause.[8] The defendant contends, therefore, that at the time when he was arrested, arraigned and brought before the court, there existed an unconstitutional conflict between the statutory provisions of § 54-46a and the applicable rules of the Practice Book.

The scope of the rule-making authority conferred upon the judiciary is ordinarily determined by the distinction between procedural and substantive law. As a general proposition, the General Assembly lacks the power to enact rules governing procedure, and the

[7] Article second of the Connecticut constitution is reprinted at footnote 5, supra. Article fifth, § 1, of the Connecticut constitution provides: "The judicial power of the state shall be vested in a supreme court, a superior court, and such lower courts as the general assembly shall, from time to time, ordain and establish. The powers and jurisdiction of these courts shall be defined by law."

[8] Before October 1, 1984, the Practice Book, in §§ 604 through 614, provided procedural rules governing grand jury indictments. These rules have now been superseded by amended rules governing prosecutions by information and complaint. Practice Book §§ 615 through 618.

Superior Court lacks the power to promulgate rules governing substantive rights and remedies. *State* v. *King,* 187 Conn. 292, 297–98, 445 A.2d 901 (1982); *Steadwell* v. *Warden,* 186 Conn. 153, 162–63, 439 A.2d 1078 (1982); *Adams* v. *Rubinow,* 157 Conn. 150, 152–58, 251 A.2d 49 (1968). However uncertain the line between procedure and substance sometimes may be, there is no room for doubt with regard to § 54-46a. We expressly held, in *State* v. *Sanabria,* supra, 690, that the implementing procedures contained in § 54-46a were "constituent parts" of the substantive rights created by amendment seventeen. That constitutional amendment, by its own terms, conferred upon the legislature, and not upon the courts, the authority to fashion "procedures prescribed by law" for hearings to determine probable cause. In these circumstances, the validity of § 54-46a is not subject to constitutional attack as a violation of separation of powers. Accordingly, we find no error in the trial court's refusal to dismiss the information charging the defendant with the crime of murder.

## II

The defendant claims that his conviction must be overturned because of two allegedly erroneous evidentiary rulings by the trial court. The defendant maintains that the trial court erred in permitting the jury to hear: (1) the incriminating statements that he made while he was a patient in the alcohol detoxification unit of Danbury Hospital; and (2) the audio tape of Raymond Pannozzo's interview by police detectives at a time when Pannozzo was suspected of having killed the victim. These claims of error invoke unrelated principles of law and thus warrant separate discussion, although we conclude that neither of them warrants reversal of the defendant's conviction.

## A

The defendant's first evidentiary claim concerns the trial court's denial of his motion in limine to suppress a number of highly incriminating statements that he made to staff and fellow patients on March 23 and 24, 1983, after he had been admitted voluntarily to the Danbury Hospital detoxification unit. The defendant told Dorothy Bauer, a sitter assigned to him by the nurses' registry, that, in connection with "a death in Bethel," he had done "something bad," that "no one would believe me." In a conversation with the unit's head nurse, Margarita Barab, the defendant admitted that he had gone to the home of an elderly woman who was the landlady of one of his drinking friends, and had there struggled to obtain money from her. He acknowledged that he had violently assaulted the woman and expressed concern over blood on the jacket that he had worn on that occasion. Speaking with Dr. John Melbourne, the head of the detoxification unit, the defendant mentioned "an old person in Bethel," and said, "I'm no good. I don't deserve to live. I should die," while also indicating uncertainty about whether he had "done it." In a group therapy session, the defendant related to another patient that "he had gone to a house in Bethel, and that a lady had surprised him and was hollering at him, and he hit her and kept hitting her." He also spoke of searching for a knife he might have thrown "in the brook."

Conceding that none of these statements falls expressly within the statutory privilege of confidential communications with a psychiatrist or a psychologist; General Statutes § 52-146c;[9] the defendant maintains that they should nonetheless have been suppressed for

---

[9] "[General Statutes] Sec. 52-146c. PRIVILEGED COMMUNICATIONS BETWEEN PSYCHOLOGIST AND PATIENT. (a) As used in this section, 'person' means an individual who, for the purpose of securing psychological

a number of statutory and other reasons. His principal claim of privilege is that the statements were protected by the provisions for confidentiality of records in the federal Comprehensive Alcohol Abuse and Alcoholism Prevention, Treatment, and Rehabilitation Act of 1970; 42 U.S.C. § 290dd-3;[10] which is incorporated into our

services, consults a licensed psychologist practicing in the area of clinical psychology.

"(b) Except as provided in subsection (c) of this section, in civil and criminal cases, in proceedings preliminary thereto and in legislative and administrative proceedings, a licensed psychologist shall not disclose any communication made to him by any person while he is engaged in the practice of clinical psychology unless the person or his authorized representative, as defined in section 52-146d, waives the privilege.

"(c) Relevant communications under this section shall not be privileged: (1) If a judge finds that any person after having been informed that the communications would not be privileged, has made the communications to a clinical psychologist in the course of a psychological examination ordered by the court, provided the communications shall be admissible only on issues involving the person's psychological conditions; or (2) if, in a civil proceeding, a person introduces his psychological condition as an element of his claim or defense or, after a person's death, his condition is introduced by a party claiming or defending through or as a beneficiary of the person, and the judge finds that it is more important to the interests of justice that the communications be disclosed than that the relationship between the person and psychologist be protected."

[10] Title 42 of the United States Code, § 290dd-3 provides in relevant part: "CONFIDENTIALITY OF PATIENT RECORDS

"(a) Disclosure authorization. Records of the identity, diagnosis, prognosis, or treatment of any patient which are maintained in connection with the performance of any program or activity relating to alcoholism or alcohol abuse education, training, treatment, rehabilitiation, or research, which is conducted, regulated, or directly or indirectly assisted by any department or agency of the United States shall, except as provided in subsection (e), be confidential and be disclosed only for the purposes and under the circumstances expressly authorized under subsection (b) of this section.

"(b) Purposes and circumstances of disclosure affecting consenting patient and patient regardless of consent. (1) The content of any record referred to in subsection (a) may be disclosed in accordance with the prior written consent of the patient with respect to whom such record is maintained, but only to such extent, under such circumstances, and for such purposes as may be allowed under regulations prescribed pursuant to subsection (g). (2) Whether or not the patient, with respect to whom any given

statutes by General Statutes § 17-155bb (b).[11] We find no error in the trial court's consideration of the applicability of these statutes.

The Comprehensive Alcohol Abuse and Alcoholism Prevention, Treatment, and Rehabilitation Act establishes a conditional and not an absolute right of non-disclosure of the records[12] of patients involved in alcohol treatment. The federal statute permits a court to order disclosure for good cause shown, after weighing "the

record referred to in subsection (a) of this section is maintained, gives his written consent, the content of such record may be disclosed as follows:

"(A) To medical personnel to the extent necessary to meet a bona fide medical emergency.

"(B) To qualified personnel for the purpose of conducting scientific research, management audits, financial audits, or program evaluation, but such personnel may not identify, directly or indirectly, any individual patient in any report of such research, audit, or evaluation, or otherwise disclose patient identities in any manner.

"(C) If authorized by an appropriate order of a court of competent jurisdiction granted after application showing good cause therefor. In assessing good cause the court shall weigh the public interest and the need for disclosure against the injury to the patient, to the physician-patient relationship, and to the treatment services. Upon the granting of such order, the court, in determining the extent to which any disclosure of all or any part of any record is necessary, shall impose appropriate safeguards against unauthorized disclosure.

"(c) Prohibition against use of record in making criminal charges or investigation of patient. Except as authorized by a court order granted under subsection (b) (2) (C) of this section, no record referred to in subsection (a) may be used to initiate or substantiate any criminal charges against a patient or to conduct any investigation of a patient."

[11] General Statutes § 17-155bb (b) provides: "RECORDS, KEEPING AND CONFIDENTIALITY OF. DISCLOSURE PERMITTED, WHEN. . . . (b) The [department] shall not permit the disclosure of the identity, diagnosis, prognosis or treatment of any such patient which would constitute a violation of federal statutes concerning confidentiality of alcohol or drug patient records and any regulations pursuant thereto, or as they may be amended from time to time; and shall adopt regulations to protect the confidentiality of information obtained by it."

[12] We will assume, for the purposes of this case, that the communications at issue in this case constitute "records" for the purposes of the federal statute.

public interest and the need for disclosure against the injury to the patient, to the physician-patient relationship, and to the treatment services." 42 U.S.C. § 290dd-3 (b) (2) (C). Applicable federal regulations indicate that the public interest in disclosure may outweigh possible damage to the treatment relationship when disclosure of material information not elsewhere available is sought for the purpose of a criminal prosecution for an extremely serious crime like homicide. 42 C.F.R. § 2.65.[13] The state gave notice to the defendant and the hospital of its intention to introduce the records at trial, in accordance with the federal statute and regulations. After a hearing on the motion in limine, in

---

[13] Title 42 of the Code of Federal Regulations, § 2.65 provides in relevant part: "INVESTIGATION AND PROSECUTION OF PATIENTS—RULES.

"(a) Applicability. This section applies to any application by an investigative, law enforcement, or prosecutorial agency for an order to permit disclosure of patient records for the purpose of conducting an investigation or prosecution of an individual who is, or who is believed to be, a present or former patient in a program.

"(b) Notice. Except where an order under § 2.66 is sought in conjunction with an order under this section, any program with respect to whose records an order is sought under this section shall be notified of the application and afforded an opportunity to appear and be heard thereon.

"(c) Criteria. A court may authorize disclosure of records pertaining to a patient for the purpose of conducting an investigation of or a prosecution for a crime of which the patient is suspected only if the court finds that all of the following criteria are met:

"(1) The crime was extremely serious, such as one involving kidnapping, homicide, assault with a deadly weapon, armed robbery, rape, or other acts causing or directly threatening loss of life or serious bodily injury, or was believed to have been committed on the premises of the program or against personnel of the program.

"(2) There is a reasonable likelihood that the records in question will disclose material information or evidence of substantial value in connection with the investigation or prosecution.

"(3) There is no other practicable way of obtaining the information or evidence.

"(4) The actual or potential injury to the physican-patient relationship in the program affected and in other programs similarly situated, and the actual or potential harm to the ability of such programs to attract and retain patients, is outweighed by the public interest in authorizing the disclosure sought."

which both the state and the defendant were given an opportunity to present argument, the court exercised its discretion to order disclosure. The defendant does not quarrel with the process by which this decision was reached, but maintains that the court should have concluded that the harm that disclosure would cause to him and to the treatment program outweighed the benefits of disclosure.

The privilege which the defendant seeks to attach to his statements at the detoxification unit is a statutory privilege and not a constitutional one. Under the circumstances, the scope of our review of the ruling of the trial court is limited. The trial court's ruling is analogous to the exercise of discretion that is required whenever the state seeks to introduce a defendant's prior criminal behavior into evidence. When a trial court, recognizing the general rule excluding such evidence, determines nonetheless that in a particular case the probative value of prior crimes evidence outweighs its prejudicial effect, we reverse such a decision "only where abuse of discretion is manifest or where an injustice appears to have been done. *State* v. *Johnson,* 190 Conn. 541, 549, 461 A.2d 981 (1983)." *State* v. *Smith,* 198 Conn. 147, 157, 502 A.2d 874 (1985); *State* v. *Morowitz,* 200 Conn. 440, 446, 512 A.2d 175 (1986). Applying that test in this case, we find no reason to overturn the trial court's denial of the defendant's motion in limine.

The defendant's remaining arguments concerning the allegedly privileged status of his statements at the detoxification unit do not warrant any extended discussion. He seeks to invoke the nondisclosure provisions of General Statutes § 19a-383,[14] but that statute

[14] "[General Statutes] Sec. 19a-383. (Formerly 19-496d). EXAMINATION AND EVALUATION. TREATMENT. NONDISCLOSURE. A person seeking treatment or rehabilitation for drug dependence shall first be examined and evaluated by a medical practitioner. Such medical practitioner shall prescribe

is limited to information elicited in the course of treatment for drug dependence, and drug dependence is itself defined, by § 19a-381 (3), as involving the use of "a controlled drug as defined in section 21a-240." Alcohol is expressly excluded from the definition of "controlled drugs" contained in § 21a-240 (8).[15] In the absence of a common law privilege of nondisclosure of communications between a patient and a physician; *State* v. *Hanna,* 150 Conn. 457, 464, 191 A.2d 124 (1963); we are unpersuaded that it was a violation of the defendant's constitutional rights to equal protection[16] for the legislature to create a statutory privilege

a proper course of treatment and medication, if needed and may prescribe a course of rehabilitation and may authorize another medical practitioner or hospital to provide the prescribed treatment or rehabilitation services. Treatment or rehabilitation services may be provided to a person individually or in a group. Any hospital providing or engaging in such treatment or rehabilitation shall not report or disclose to a law enforcement officer or agency the name of any person receiving or engaging in such treatment or rehabilitation; nor shall any person receiving or participating in such treatment or rehabilitation report or disclose the name of any other person engaged in or receiving such treatment or rehabilitation or that such program is in existence, to a law enforcement officer or agency. Such information shall not be admitted in evidence in any court, grand jury or administrative proceeding; provided any person engaged in or receiving such treatment or rehabilitation may authorize the disclosure of his name and the fact of his individual participation."

[15] General Statutes § 21a-240 (8) provides: " 'Controlled drugs' are those drugs which contain any quantity of a substance which has been designated as subject to the Federal Controlled Substances Act, or which has been designated as a depressant or stimulant drug pursuant to federal food and drug laws, or which has been designated by the commissioner of consumer protection pursuant to section 21a-243, as having a stimulant, depressant or hallucinogenic effect upon the higher functions of the central nervous system and as having a tendency to promote abuse or psychological or physiological dependence, or both. Such controlled drugs are classifiable as amphetamine-type, barbituate-type, cannabis-type, cocaine-type, hallucinogenic, morphine-type and other stimulant and depressant drugs. Specifically excluded from controlled drugs and controlled substances are alcohol, nicotine and caffeine."

[16] The defendant invokes both his federal right to equal protection under the fourteenth amendment to the United States constitution and his state right to equal protection under article first, § 20, of the state constitution.

that encompasses drug addiction but not alcohol addiction. It was entirely reasonable for the legislature to conclude, in the exercise of its police power, that the widespread problem of dependence on controlled drugs required remedial action. To implement its public purpose of providing state support for drug dependence treatment programs, the legislature might reasonably have determined that effective treatment programs had to encompass treatment incentives that would take into account the fact that possession of controlled drugs is ordinarily illegal. Thus, the legislature could rationally create a greater privilege of nondisclosure for the class of those involved in drug treatment programs than for those involved in alcohol treatment programs. The law of equal protection requires no more. See, e.g., *Daily* v. *New Britain Machine Co.,* 200 Conn. 562, 577–80, 512 A.2d 893 (1986); *Beccia* v. *Waterbury,* 192 Conn. 127, 133–34, 470 A.2d 1202 (1984).

The defendant had no cognizable expectation of privilege under any of the other theories he has advanced. There is neither a claim nor a finding that those in whom he confided at the Danbury Hospital held themselves out to be psychologists or psychiatrists. There is therefore no privilege under General Statutes §§ 52-146c or 52-146d even if, as the defendant claims on appeal, he reasonably believed that the health professionals to whom he spoke were psychologists or psychiatrists.[17] We have no reason to doubt the defendant's assertion that the therapeutic atmosphere at the detoxification unit was conducive to communications which might not be made in other settings. We are unprepared, however, to recognize a constitutional or a common law right of privacy in such a situation. As discussed earlier, our federal and state statutes have established limited privileges for records of patients

---

[17] Since the defendant did not himself testify at his trial, the record fails, in any case, to substantiate his claim that he held such a belief.

involved in alcohol and drug treatment, which, as the trial court concluded, do not apply in the particular circumstances of this case. Finally, we reject the defendant's argument that his statements at the hospital were admissions which the state failed to prove voluntary. Having been made in a noncustodial setting, the defendant's incriminatory statements are admissible without a prior showing by the state that they were voluntarily made. See *Colorado* v. *Connelly,* 479 U.S. 157, 166–67, 107 S. Ct. 515, 93 L. Ed. 2d 473 (1986).

### B

The defendant's other evidentiary claim concerns the trial court's denial of his objection to the playing of audio tapes of the police interrogation of Raymond Pannozzo. This evidentiary issue arose in the context of the defendant's efforts to persuade the jury that it was Pannozzo who had killed the victim. After Pannozzo had testified for the state about his lack of involvement with the crime, the defendant cross-examined him extensively about a written confession that he had previously given to the police. As a part of this cross-examination, Pannozzo read his confession aloud to the jury.[18] The state, on redirect examination, questioned Pannozzo about the circumstances leading to his confession. It offered the interrogation tapes into evidence in order to show Pannozzo's state of mind when he confessed: his apparent confusion and memory lapses, his concern for his drinking problem, and his emotional and distraught behavior. Admitting the tapes for this limited purpose, over the defendant's objection, the trial court immediately cautioned the jury that their contents were not proof of the truth of what had been said, and later repeated this caution in its instructions to the jury.

---

[18] Prior to the defendant's trial for the murder of Hazel Clinkard, Pannozzo had been charged and tried for the same crime. In that trial, Pannozzo's confession had been excluded from evidence, presumably on the ground that it was involuntary. Pannozzo's trial resulted in an acquittal.

The defendant claims that the tape was inadmissible both because it was hearsay and because its limited probative value was outweighed by its prejudicial effect. We disagree. Offered to establish the context of the Pannozzo confession, the tape was not hearsay as its use was limited to proof of Pannozzo's state of mind during his interview by the police. *State* v. *Sharpe,* 195 Conn. 651, 661–62, 491 A.2d 345 (1985); *State* v. *Periere,* 186 Conn. 599, 605–607, 442 A.2d 1345 (1982); *State* v. *Packard,* 184 Conn. 258, 274, 439 A.2d 983 (1981). This evidence was highly relevant to rebut the inference that the jury would otherwise have been likely to draw from the fact of Pannozzo's confession, which was potentially very damaging to the state's case. It was within the province of the trial court to determine whether, on balance, the probative value of this evidence outweighed its potentially prejudicial impact on the defendant. *State* v. *Periere,* supra, 607–608. We can discern no abuse of discretion in the trial court's decision to admit this evidence in this case.

### III

The defendant maintains that the trial court erred in its instructions to the jury when it: (1) included an inappropriate example of what is meant by reasonable doubt; (2) denied the defendant's request to charge concerning motive; (3) permitted the jury to consider a possible sexual assault as relevant to the defendant's intent to commit murder when the defendant had not been charged with sexual assault; and (4) failed to instruct the jury properly with regard to the relationship between intoxication and intent. These claims warrant only limited review. We find no error.

Turning first to the charge on reasonable doubt, we note that the defendant claims that the trial court improperly included an example of what might constitute reasonable doubt that was based on a hypotheti-

cal case of robbery unrelated to the crime with which the defendant was charged.[19] This claim of error has not been briefed in accordance with the requirements of the rules of practice, since neither the defendant's brief nor his appendix contains a verbatim statement of the exception that he took at trial. Practice Book

[19] The trial court provided the following example to the jury: "Lets say that—well, without getting into the technical specifications of it, let's call it the language of the street. Someone is on trial for armed robbery. You hear testimony from, well, the dispatcher for a taxi company, that he received a call asking that a taxi cab be sent to a certain location. In accordance with standard operating procedures, he enters up in his log the time of the call and the place to which the cab is to go, and then he asks the caller for name and telephone number, which he also enters up in his log. He then gets on the radio and he contacts an available cab and orders him to go to that particular location. The cabdriver testifies that he responded. He went to that particular location. When he got there, he looked around, there wasn't anybody there. Whereupon, he got on his radio and informed the dispatcher that it appeared to be a 'no show.' Following again standard procedure, why, the dispatcher got on the telephone and dialed the number which had been given to him. A person answers, whose voice is completely different from the voice he heard before. He inquires as to whether or not they had ordered a cab. He answers 'no.' He inquires as to whether or not it's such and such an address. He says, 'Oh, no. We live over on the other side of town.' Meanwhile, back at the ranch, the taxi driver testifies that he's then approached by a person who pulls out a gun and demands his money. He hands over the day's receipts from prior fares, which totalled thirty-five dollars. The accoster then becomes rather upset and says, 'Hey, you must have more money than that.' So the cabdriver testifies that he pulls out his wallet, hands it across, it has a five dollar bill in it, the accoster takes the five dollar bill and throws the wallet down on the ground. The accoster is then quite upset that this is all that he got out of it. So he proceeds to pistol-whip the cabdriver, inflicts injuries on his head, and then leaves. The cabdriver then gets on the radio, reports to his dispatcher that he's just been held up and beaten. The dispatcher summons the police. A squad car responds. The policeman observes wounds on the cabdriver's face. He also sees a wallet on the ground. He picks it up and in it is the driver's license of the cabdriver. The cabdriver is then transported to the emergency room, where he is treated and discharged.

"All right. You hear all of this. You go off in the back room to deliberate. All of a sudden one of you says, 'Hey, wait a minute. Maybe this is a scam. Maybe that cabdriver is embezzling from his employer and he's trying to cover it up.'

"Okay. The State has not proven that he wasn't embezzling, and there is no question but that there are occasions when people who do embezzle

§ 4065 (d) (2) (formerly § 3060F).[20] The importance of this rule is highlighted by an examination of the exception as actually taken, which could fairly have been understood by the trial court as raising no issue other than possible confusion arising out of the court's emphasis of what did not constitute reasonable doubt rather than out of what would so qualify. On this state of the record, although we continue to doubt the advisability of verbal elaboration of the meaning of reasonable doubt; *State* v. *DelVecchio,* 191 Conn. 412, 417–21, 464 A.2d 813 (1983); we are not persuaded that *DelVecchio* is controlling. Elsewhere in its instructions, the trial court repeatedly correctly instructed the jury about the state's burden of proving each element of the crime beyond a reasonable doubt. Applying the standard of review appropriate under *State* v. *Evans,* 165 Conn. 61, 65, 327 A.2d 576 (1973), we therefore conclude that there was no reversible error in the trial court's effort to illuminate that construct through an illustration. See also *State* v. *Simms,* 201 Conn. 395, 419, 518 A.2d 35 (1986).

---

[, or] fabricate a crime in order to cover it up. But under the totality of the circumstances, would that be a reasonable doubt? The infliction of the wounds on his face over thirty-five dollars? The wounds are such that he had to get medical treatment. I think you'd agree with me that, under circumstances such as that, it is not a reasonable doubt. Now, for a thousand dollars, why, maybe. You take the totality of the circumstances in deciding whether or not any doubt you may have is reasonable. Again, a reasonable doubt isn't one which you'll have simply in order to have a doubt.

"However, this is of real importance. If in your consideration you decide that some particular fact has been proven, but that it is as consistent with innocence as it is with guilt, then you must accord it the interpretation which is consistent with innocence, because if it's consistent with both, then you've got a reasonable doubt."

[20] Practice Book § 4065 (d) (2) provides: "When error is claimed in the charge to the jury, the brief or appendix shall include a verbatim statement of all relevant portions of the charge and all relevant exceptions to the charge. Evidence relevant to the claimed error shall be printed in narrative form with appropriate references to the page or pages of the transcript."

The defendant's second claim is that the trial court erred in its refusal of his request to charge on motive. This claim of error also is improperly briefed, because the defendant has nowhere reproduced "a verbatim statement of the relevant portions of the charge as requested and as given by the court and any relevant exceptions to the charge as given . . . ." Practice Book § 4065 (d) (1).[21] In light of this total noncompliance with our rules of practice, we decline to entertain a plenary review of this issue. *Weintraub* v. *Richard Dahn, Inc.,* 188 Conn. 570, 571–72, 452 A.2d 117 (1982); see also *State* v. *Vass,* 191 Conn. 604, 621, 469 A.2d 767 (1983). While evidence of motive may be desirable and important in determining the strength of the state's case, such evidence is not a necessary element of the crime of murder. *State* v. *Harris,* 182 Conn. 220, 223–24, 438 A.2d 38 (1980); *State* v. *Annunziato,* 169 Conn. 517, 530, 363 A.2d 1011 (1975); W. LaFave & A. Scott, Criminal Law (1972) § 29, p. 204. Failure expressly to instruct on motive, in the absence of an appropriate request to charge, is therefore not a miscarriage of justice. *State* v. *Annunziato,* supra.

The defendant asserts, in his third claim of error, that the court's instructions on intent incorrectly alluded to an uncharged sexual assault on the victim. Again we note that the defendant's appellate brief lacks the verbatim statement of "relevant exceptions to the charge" that is required by Practice Book § 4065 (d) (2).

---

[21] Practice Book § 4065 (d) (1) provides: "In a jury case when error is claimed in the trial court's refusal to charge as requested, the party claiming such error shall request the clerk of the trial court to include, in the certified file, copies of the relevant written request to charge contained in the trial court's file and shall print in his brief or appendix a verbatim statement of the relevant portions of the charge as requested and as given by the court and any relevant exceptions to the charge as given and shall print in narrative form any evidence which he claims would entitle him to the charge as requested, with appropriate references to the page or pages of the transcript."

The trial court noted the evidence of a sexual assault in the course of its recital of the circumstances and the manner of the victim's death.[22] We fail to perceive how this recital could have misled the jury in this case in which the focus of the defense was not whether a crime had been committed but rather the identity of its perpetrator. Viewed as a whole, the trial court's main and supplemental instructions adequately and accurately informed the jury of the elements of the crime that the state was required to prove in order to establish that the defendant was guilty as charged. *State* v. *Simms,* supra, 416; *State* v. *Cobb,* 199 Conn. 322, 326–30, 507 A.2d 457 (1986). The defendant was not deprived of a fair trial by this aspect of the instructions on intent.

The defendant's fourth and final disagreement with the court's instructions concerns the effect of intoxication on intent. The court informed the jury that a finding of intoxication would militate against a finding of criminal intent. The defendant concedes that, at the trial, he took no exception whatsoever to this aspect of the instructions. He relies therefore on review

---

[22] The relevant portion of the charge is as follows: "Intent. Well, you do have various factors which are in evidence. There is the fact that Hazel was struck so hard as to break bones in her face. The opinion of the expert was that it would require several blows in order to achieve that result. You have the physical evidence of the pillows. You have the physical evidence of the multiple stab wounds. Even though they probably, based on the expert testimony, were inflicted after death, or at least after Hazel was in such condition that her blood pressure dropped to a very low level, the repeated insults to her body can be considered by you on this question of intent. There was evidence of a sexual assault. Certainly, semen was found in her vagina, or upon her body some place. I'll leave you to your own good common sense as to whether or not there can be an ejaculation such as that without it being intended. Now, balancing that, of course, you must take into consideration the rather significant imbibing of alcoholic beverages, because if you do come to the conclusion that whoever the actor was who committed this crime was in an intoxicated state, that would militate against his having the intent to do what was done. It would not absolutely rule it out. Even a drunk can intend to do something. But it is a factor to be considered by you."

under *State* v. *Evans,* supra, as a basis for his claim that the trial court erred in not specifically stating that it was the burden of the state to persuade the jury beyond a reasonable doubt that despite the defendant's intoxication, he had the necessary specific intent to commit the crime of murder. Even though review under *Evans* is appropriate to consider whether there was constitutional error in the instructions on intent; *State* v. *Stevenson,* 198 Conn. 560, 567–72, 504 A.2d 1029 (1986); we find no such error in the instructions as given. Viewing the main and supplemental instructions on burden of proof and on intent in their entirety, we are persuaded that the jury could not have been misled about the scope of the state's responsibility to establish, beyond a reasonable doubt, that the defendant specifically intended to kill the victim.

IV

In his last claim of error, the defendant maintains that the trial court should have granted his motion for acquittal on the ground that the evidence at trial was insufficient to support the jury verdict finding him guilty of murder. Although he does not question that the evidence established the commission of a homicide, he argues that the state did not prove, beyond a reasonable doubt, either his role in that crime or his specific intent to commit it. We agree with the state that the jury could have found the defendant's guilt to have been proven beyond a reasonable doubt.

In accordance with well established principles, appellate analysis of a claim of insufficiency of the evidence requires us to undertake a twofold task. "We first review the evidence presented at the trial, construing it in the light most favorable to sustaining the jury's verdict. We then determine whether, upon the facts thus established and the inferences reasonably drawn therefrom, the jury could reasonably have concluded

that the cumulative effect of the evidence established guilt beyond a reasonable doubt . . . . In this process of review, it does not diminish the probative force of the evidence that it consists, in whole or in part, of evidence that is circumstantial rather than direct." *State* v. *Sinclair*, 197 Conn. 574, 576, 500 A.2d 539 (1985), and cases there cited.

Given the admissibility of the defendant's incriminatory statements at the alcohol detoxification unit, there was ample evidence of his role in the murder of the victim. The jury could reasonably have concluded that the defendant had killed the victim in light of the evidence that he had access to her house, had entered the house in the middle of the night, and had left his bloody jacket in the bedroom where she had been murdered. The evidence of the specific intent necessary to convict the defendant of murder was, as usual, more circumstantial. The state adduced the following: the defendant knew that the victim kept money in her bedroom, disposed of a knife that might have been the murder weapon in a nearby brook, told the police inconsistent stories about the whereabouts of his jacket, and related many incriminating details to those to whom he spoke at the detoxification unit. From this evidence, the jury might reasonably have determined that, despite his drinking,[23] the defendant retained the capacity to form a specific intent to commit the crime of murder with which he had been charged.

There is no error.

In this opinion the other justices concurred.

---

[23] As the state points out, the defendant presented no testimony about how much alcohol he had in fact consumed on the day before the murder, or what effect it had on him that night.