STATE OF CONNECTICUT *v.* ANTHONY CHAPMAN
(5093)

STATE OF CONNECTICUT *v.* MELVIN DANIELS
(5097)

BORDEN, DALY and NORCOTT, Js.

Argued May 9—decision released September 6, 1988

*Adele V. Patterson,* certified legal intern, with whom were *Timothy H. Everett* and, on the brief, *Michael R. Sheldon* and *Todd D. Fernow,* for the appellant (defendant in the first case).

*James L. Radda,* special public defender, for the appellant (defendant in the second case).

*Geoffrey E. Marion,* deputy assistant state's attorney, with whom, on the brief, was *Robert J. Devlin,* assistant state's attorney, for the appellee (state).

BORDEN, J. In these combined appeals, the defendants challenge the judgments of conviction, after a jury trial, of robbery in the first degree in violation of General Statutes § 53a-134 (a) (4), and of criminal attempt to commit robbery in the first degree in violation of General Statutes §§ 53a-134 (a) (2) and 53a-49. The defendant Anthony Chapman raises three claims of error: (1) the trial court erred in admitting into evidence the in-court identification testimony of a witness because the identification was tainted and unreliable as a matter of constitutional law; (2) the court abused its discretion in failing to grant defense counsel's request for a recess in which to prepare further cross-examination of the identifying witness; and (3) the court erred in refusing to admit into evidence a tape recording of the telephone conversation of another witness made on the night of the crime. The defendant Melvin Daniels joins Chapman's third claim of error, and, in addition, claims that the trial court denied him a fair trial when it admitted the challenged identification of Chapman and when it denied Chapman's request for a recess. We find no error.

The jury could reasonably have found the following facts. At approximately 9 p.m. on July 26, 1985, three men committed a robbery at the New China Restaurant on Howe Street in New Haven. One robber wore a

stocking mask and two wore bandanas. One of the men wearing bandanas also carried a sawed-off shotgun. Shortly before 10 p.m., another robbery occurred at an Exxon station on Whalley Avenue in New Haven. Two men, one wearing a stocking mask and one wearing a bandana and carrying a sawed-off shotgun, entered the Exxon station and demanded that the night manager, John Cooke, empty the register. When Cooke hesitated, the robber wearing the bandana poked the shotgun in Cooke's face, cutting his upper lip. The robbers then fled with the contents of the cash register and various items and cash taken from Cooke and two bystanders. Immediately thereafter, a customer handed Cooke a slip of paper on which he had noted the license plate number of the robbers' car. Less than a minute later, a similar robbery occurred at a convenience store two blocks away.

The police traced the license plate number of the car to Louise Mabry. She had loaned the car that evening to a friend, James Owens. After his arrest, Owens cooperated with the police, confessing his part in the three robberies and identifying the other two participants as Chapman and Daniels.

At the joint trial of Chapman and Daniels, four witnesses to the New China Restaurant robbery testified. Three witnesses, including Cooke, testified regarding the robbery of the Exxon station, and three witnesses regarding the convenience store robbery. Because the robbers had been wearing masks, however, none of the witnesses were able to identify either Chapman or Daniels before trial.

During a recess following the completion of Cooke's testimony, Cooke informed the state that he recognized Chapman, who had been sitting at counsel table, as the robber with the shotgun. After the recess, the state moved to recall Cooke to identify Chapman. Chapman's

counsel objected; counsel for Daniels was silent. The court heard argument, out of the jury's presence, on the admissibility of Cooke's identification testimony. Cooke's examination by Chapman's counsel during this hearing revealed that Cooke had been informed by the state[1] that Owens had turned state's evidence. The trial court overruled Chapman's objection and denied the request of Chapman's counsel for a recess in which to prepare his cross-examination of Cooke's identification testimony.

When the jury returned, Cooke testified that he had recognized Chapman's eyes when the two exchanged glances during Cooke's previous examination. On cross-examination, Cooke admitted that his recognition was based solely on Chapman's eyes and the shape of his head, which, because of the bandana, was all Cooke was able to see during the robbery. Cooke testified that he was "99 percent sure" that Chapman was the robber with the shotgun.

## I

Chapman first claims that the suggestive setting of Cooke's in-court identification, together with the fact that Cooke had been told that Owens was turning state's evidence, rendered Cooke's identification of Chapman unreliable and inadmissible as a matter of constitutional law. We disagree.

Chapman's reliance upon cases that apply to out-of-court identification procedures that taint an in-court identification is misplaced. Those cases focus on the propriety of police or prosecutorial identification proce-

---

[1] On cross-examination, Cooke could not recall precisely who gave him the information, although he did admit that it was probably the New Haven police or the state's attorney's office. Chapman's trial counsel alleged, during the hearing on Chapman's motion to suppress, that the "probation department" was the responsible party. The state's brief is silent on the issue, as was the assistant state's attorney at trial.

dures before trial that might taint a subsequent in-court identification. See, e.g., *Manson* v. *Brathwaite,* 432 U.S. 98, 97 S. Ct. 2243, 53 L. Ed. 2d 140 (1977); *Neil* v. *Biggers,* 409 U.S. 188, 93 S. Ct. 375, 34 L. Ed. 2d 401 (1972); *State* v. *Gold,* 180 Conn. 619, 431 A.2d 501, cert. denied, 449 U.S. 920, 101 S. Ct. 320, 66 L. Ed. 2d 148 (1980); *State* v. *Nelson,* 4 Conn. App. 514, 495 A.2d 298 (1985). A different rule applies regarding the in-court identification of a defendant where, as here, there has been no pretrial identification; the in-court identification testimony is admissible " 'within the discretion of the trial court, with the weight of the identification to be determined by the jury.' " *State* v. *Elliott,* 8 Conn. App. 566, 571, 513 A.2d 1285 (1986); *State* v. *Frazier,* 7 Conn. App. 27, 37, 507 A.2d 509 (1986).

Chapman makes much of the fact that Cooke was informed that Owens was turning state's evidence against the other defendants. He urges us to employ this occurrence as a surrogate for an actual pretrial identification procedure, claiming that the information about Owens strongly suggested that the police believed they had apprehended the guilty parties, and that this suggestion tainted Cooke's in-court identification. We do not find this position persuasive.

Chapman does not suggest that the information about Owens reached Cooke by design or as the result of any police or prosecutorial procedure. *State* v. *Elliott,* supra, 569 (a defendant attempting to suppress identification evidence has the burden of proving that identification resulted from some unconstitutional procedure); see *State* v. *Aversa,* 197 Conn. 685, 693, 501 A.2d 370 (1985); *State* v. *Fullwood,* 193 Conn. 238, 244, 476 A.2d 550 (1984); see also *State* v. *Nelson,* supra, 516. Nor is it likely that the information in question imprinted the image of Chapman on Cooke's mind in such a way that his recognition of Chapman's face

must have been derived from the suggestive information. "Reliability is the linchpin in determining the admissibility of identification evidence." *Manson* v. *Brathwaite,* supra, 114. The information in question does not cast suspicion upon the reliability of the witness' identification in the same way, or to the same degree, as a genuine visual confrontation. It is generically different from a suggestive out-of-court identification procedure and therefore does not trigger constitutional scrutiny. The information created a potential weakness in the witness' credibility which defense counsel was free to probe on cross-examination. "The innate weakness in any in-court testimonial identification is grounds for assailing its weight rather than its admissibility." *State* v. *Smith,* 200 Conn. 465, 470, 512 A.2d 189 (1986).

## II

Chapman next claims that the trial court erred in refusing to grant his request for a recess in order to prepare further cross-examination of Cooke after the trial court denied his motion to suppress Cooke's identification testimony. This claim is without merit.

The decision to grant or deny a continuance lies within the sound discretion of the trial court and will not be disturbed absent a clear abuse of that discretion. *State* v. *Huff,* 10 Conn. App. 330, 346, 523 A.2d 906, cert. denied, 203 Conn. 809, 525 A.2d 523 (1987). No such abuse is shown unless the trial court acted arbitrarily and substantially impaired the defendant's ability to defend himself. Id.

The record does not support Chapman's claim of abuse of discretion. Chapman argues that he was surprised by Cooke's revelation that he recognized Chapman, and that he required further time to prepare his cross-examination. Chapman has failed to identify, however, any particular way in which he would have been aided

had he been given further time to prepare his cross-examination. He had already cross-examined Cooke extensively earlier in the day; the only subject upon which further cross-examination would be allowed was Cooke's in-court identification, and the record does not indicate any shortcoming or defect in that examination attributable to a lack of preparation.

## III

Chapman and Daniels both claim that the court violated their rights of confrontation and abused its discretion by refusing to admit into evidence, for impeachment purposes, tape recordings of two telephone conversations between Owens and Mabry made on the night of the crime. We disagree.

On the night of the robberies, before the arrest of Owens and his subsequent decision to cooperate with the police, the police tape recorded two telephone conversations between Owens and Mabry, the owner of the car used in the robberies. Mabry, who was cooperating with the police, repeatedly questioned Owens about his participation in the robberies. Owens denied participating in or having any knowledge of the robberies; he fabricated an elaborate story to explain how Mabry's car, which he had borrowed, could have been used in three robberies without his knowledge. On the phone with Mabry, he swore to the truth of his story over the graves of his mother and his child.

On direct examination at trial, Owens described the three robberies and identified Chapman and Daniels as his accomplices. Chapman and Daniels cross-examined Owens extensively on the circumstances surrounding his testifying for the state,[2] and on the contents of the

---

[2] On cross-examination, Owens testified, inter alia, to the following: (1) he had been charged with a total of nine counts, including robbery and conspiracy, stemming from the robberies; (2) he had a prior felony record and was facing over one hundred years in prison; (3) he had struck a good deal

tape. He testified that virtually every element of his story to Mabry on the telephone, including his repeated denials of involvement in the robberies, were lies.

The defendants then sought to further their impeachment of Owens by introducing the tape recorded conversations. They argued that the tape was admissible to impeach Owens because it contained his denials of involvement in the crimes, was replete with prior inconsistent statements, and demonstrated his concern for himself and his lack of concern for Mabry. They also argued that the tape revealed in a way that could not be reproduced on cross-examination Owens's ready capacity to lie.[3] The court after listening to the forty minute tape in camera, sustained the state's objection. The defendants duly excepted.

The general rule is that restrictions on the scope of cross-examination are within the sound discretion of the trial court, but this discretion comes into play only after the defendant has been permitted cross-examination sufficient to satisfy the confrontation clause of the sixth amendment. *State* v. *Cox,* 7 Conn. App. 377, 384, 509

---

with the state's attorney's office which would significantly reduce the time he spent in prison; (4) he was aware that his cooperation with the state would be made known to the judge sentencing him; (5) the length of his prison term would depend on his performance in court; (6) he has no qualms about lying to the police when it suits his interests; and (7) swearing to the truth did not mean much to him.

[3] The defendant also raises this argument on appeal, citing *State* v. *Rollinson,* 203 Conn. 641, 526 A.2d 1283 (1987), to support the proposition that a tape recording that shows the context and demeanor of a witness when making an out-of-court statement is admissible. *Rollinson,* however, does not support this claim. In *Rollinson,* the issue of the tape's admissibility "arose in the context of the defendant's efforts to persuade the jury that it was [the state's witness] who killed the victim. [The state's witness] had testified for the state about his lack of involvement with the crime; the defendant [then] cross-examined him extensively about a written confession that he had previously given to the police. As a part of this cross-examination, [the state's witness] read his confession aloud to the jury. The state, on redirect examination, questioned [the state's witness] about the circumstances leading to his confession. It offered the interro-

A.2d 36 (1986). "A claim of undue restriction on cross-examination ordinarily involves a two-pronged analysis: (1) whether the constitutional standard has been met; and (2) if so, whether the court nonetheless abused its discretion." *State* v. *Diorio*, 12 Conn. App. 74, 76, 529 A.2d 1320 , cert. denied, 205 Conn. 813, 532 A.2d 587 (1987), cert. denied, 484 U.S. 1065, 108 S. Ct. 1025, 98 L. Ed. 2d 990 (1988). The constitutional standard is satisfied when a defendant has been " 'permitted to expose to the jury the facts from which jurors, as the sole triers of fact and credibility, could appropriately draw inferences relating to the reliability of the witness.' " *State* v. *Jones*, 205 Conn. 638, 669, 534 A.2d 1199 (1987).

The constitutional standard was met in this case. Both defendants were permitted to question Owens at length regarding his character, his habitual lying, and his strong motive for testifying for the state. This cross-examination clearly revealed Owens's motive for giving a good performance for the state, and illustrated his history of lying whenever it was in his interests to

gation tapes into evidence in order to show [the state's witness'] state of mind when he confessed; his apparent confusion and memory lapses, his concern for his drinking problems, and his emotional and distraught behavior." Id., 659. The trial court admitted the tapes, cautioning the jury that their contents were not proof of what had been said.

The situation in *Rollinson,* therefore, differs in several material aspects: the defense was not merely impeaching the credibility of the state's witness but was accusing the witness of committing the very crime for which the defendant was being tried. The tapes, now bearing directly on the issue of whether the defendant was the killer, were admitted only to place in context the otherwise highly suggestive confession of the witness. In *Rollinson,* the court stated: "[t]his evidence was *highly relevant* to rebut the inference that the jury would *otherwise have been likely to draw* from the fact of [the state's witness'] confession, which was potentially very damaging to the state's case." (Emphasis added.) Id., 660. In the present case, there was no likelihood of the jury reaching an erroneous decision but for the admission of the tapes. The defendants sought the admission of the tapes in order to complete the impeachment of a witness whose credibility had already been thoroughly attacked.

do so. The tape was not played for the jury primarily because the trial court believed that the few statements on the tape that Owens had not unequivocally admitted making dealt with collateral issues. We are confident that the jury, even without hearing the tape, was presented with sufficient facts from which it could appropriately draw inferences regarding the reliability of Owens.

Nor did the trial court abuse its discretion by refusing to admit the tape into evidence. " ' "To establish an abuse of discretion, appellants must show that the restrictions imposed upon their cross-examination were clearly prejudicial." ' *State* v. *Gaynor,* [182 Conn. 501, 510, 438 A.2d 749 (1980)]. Our review of the transcript indicates that the [defendants were] not prejudiced. The [defendants were] permitted the opportunity to cross-examine the state's witness extensively regarding bias or improper motive. When the right to cross-examine to demonstrate bias, motive, or prejudice is not altogether denied, the scope and extent of the cross-examination rests in the court's discretion." *State* v. *Diorio,* supra, 77.

## IV

We turn our attention last to the claim of Daniels that the court violated *his* right to a fair trial when it allowed the state to present the in-court identification of Chapman by Cooke, and when it denied Chapman's request for a recess in which to prepare for cross-examination of Cooke after his identification of Chapman. Because Daniels failed to raise these claims in the trial court, these claims appear before us "necessarily swaddled in the hopeful mantle of [*State* v. *Evans,* 165 Conn. 61, 327 A.2d 576 (1973)] . . . ." *State* v. *Cosby,* 6 Conn. App. 164, 172, 504 A.2d 1071 (1986).

We decline to review these claims. Although Daniels asserts that his claims involve the colorable depriva-

tion of fundamental constitutional rights and a fair trial, "our limited review of the record discloses . . . that the defendant's [claims are] not truly of constitutional proportions, but [are] simply characterized as such by him." *State* v. *Huff*, supra, 335.

Our refusal to review these claims is reinforced by the fact that counsel for Daniels did not make these claims at all, even as he sat at counsel table and observed Chapman's counsel present them properly to the trial court. We cannot imagine that, under these circumstances, the failure of Daniels to make his objections known was mere inadvertence. The inference is overwhelming that his silence was a trial tactic, employed to emphasize that Cooke's identification testimony implicated only Chapman, and not Daniels. Compare id., 338 n.6. "[H]is silence at trial is a powerful signal that, because of the posture of the case, he did not [view the trial court's rulings] in the harmful manner which he presses on appeal, or even if he did so [view them], he did not deem [them] harmful enough to press in the trial court. When the principal participant in the trial whose function it is to protect the rights of his client does not deem an issue harmful enough to press in the trial court, the appellate claim that the same issue clearly deprived the defendant of a fundamental constitutional right and a fair trial . . . is seriously undercut." Id., 338.

There is no error in either appeal.

In this opinion the other judges concurred.