STATE OF CONNECTICUT *v.* RALPH LAGO, SR.
(9866)

FOTI, LAVERY and FREEDMAN, Js.

10

Argued February 21—decision released June 23, 1992

*Wesley W. Horton,* with whom were *Robert M. Shields, Jr., David B. Harting,* and, on the brief, *Richard J. Joseph,* for the appellant (defendant).

*James A. Killen,* assistant state's attorney, with whom, on the brief, were *John Connelly,* state's attorney, and *Edward Ricciardi,* assistant state's attorney, for the appellee (state).

FOTI, J. The defendant appeals from the judgment of conviction, rendered after a jury trial, of arson in the second degree in violation of General Statutes § 53a-112 (a), and insurance fraud in violation of General Statutes § 53a-215 (a) (1).[1] On appeal, the defendant raises three claims. He contends that the trial court improperly (1) permitted unreliable identification testimony, (2) instructed the jury on the defendant's failure to call a witness, and (3) found sufficient evidence to convict the defendant of insurance fraud and, therefore, denied his motion for a new trial. We affirm the judgment of the trial court.

The jury reasonably could have found the following facts. On April 20, 1989, a fire destroyed the house of Diana Lago at 48 East Street in Wolcott. She had been awarded sole possession of the house after her divorce from the defendant. The defendant resented her pos-

---

[1] The jury found that the defendant was the actual perpetrator of the arson; the defendant was found not guilty of the crime of arson in the first degree in violation of General Statutes § 53a-111 (a).

session of the house and had threatened her life, telling her she would never enjoy the house and that she was not going to keep it. After the fire, the defendant indicated that if she rebuilt the house with insurance proceeds, it would "go up again," with her in it. In February, 1989, Diana Lago had changed the locks of the house and found that on March 8 the defendant had entered the house and that all the locks had been removed. The following day, Diana Lago discovered that new locks had been installed on the doors. She called the police. Upon their arrival, she entered the house to find all the lights on and the thermostats turned all the way up. The defendant called Diana Lago later that evening and told her that he had left a key on a table. The key fit only the door leading to the basement exit. Subsequently, only she and the defendant had keys to the house. A few days prior to the fire, she discovered that someone had dismantled the fire alarm system in the house.

On the night of the fire, Diana Lago left the house at approximately 6:05 p.m. Her friend picked her up to go bowling, as they had done every Thursday evening for ten years. She locked the house with her dog inside. Soon after leaving the house, Diana Lago and her friend observed the defendant driving his Ford van in the direction of the house on a road that intersects with East Street. At approximately 6:30 p.m., an acquaintance of the defendant observed him driving his van away from East Street. At the time, the defendant was wearing a red plaid jacket. Between 6:20 and 6:30 p.m., a neighbor saw Diana Lago's dog outside, but did not observe anything unusual or any indication of smoke or fire.

At approximately 7:45 p.m., Robert Trerice, a lieutenant of the Waterbury fire department, drove by the Lago house. He observed heavy smoke and flames shooting out of the back of the house. He watched a

man step out of the front door and appear to try to lock it. The man was approximately 5 feet 8 inches tall with a husky build, and dark hair which was gray or white around the ears. He was approximately forty to fifty years old. The man was wearing blue or green industrial type work clothes. Trerice also observed two cars in the driveway, one of which was medium sized and similar to a Datsun or Toyota. Trerice proceeded to the firehouse and returned shortly thereafter with the fire department. He did not see the man at the scene upon his return.

At approximately the same time that Trerice passed the house, a neighbor witnessed flames and smoke at the Lago house from her backyard. She also heard screeching tires and observed a small brown car pull out of the Lago driveway and proceed north toward Wolcott center. She described the car as similar to a Toyota Corolla or small Mustang, with dark windows seemingly covered in dark plastic. The vehicle did not appear to have any chrome or bumpers. The screeching tires reminded her of the way that the defendant's son, Ralph Lago, Jr., drove when he lived at the house.

Shortly thereafter, Larry Thomas, a fireman, was driving south on County Road. He observed a small orange-brown Toyota type car proceed at a high rate of speed through the stop sign at County Road and East Street. A few minutes later he saw a large column of black smoke coming from the area of the Lago residence. He later identified a car sitting in the driveway of the defendant's son's house as the one he had seen go through the intersection.

When the firefighters arrived at the Lago house, they found all of the doors locked. Although the fire had not been burning long, the house was fully in flames. Firefighters were able to detect the presence of an accelerant. On the following day, it was determined that the

fire had been ignited intentionally and that an accelerant had been used. The living room, which had sustained the most damage, smelled of gasoline. Tests indicated the presence of gasoline and number two fuel oil or diesel fuel. Typically, gasoline is combined with fuel oil and used as an accelerant because gasoline is easier to ignite, and number two fuel oil causes the accelerant to burn longer than if gasoline alone is used. The defendant's oil truck, which was parked in the Lago driveway, contained number two fuel oil. According to Christine Bosco and John Korab, attendants at two different gas stations in Wolcott, a man fitting the defendant's description purchased gasoline in a container from them on the day of the fire.

## I

The defendant first claims that the trial court improperly permitted the introduction of unreliable testimony that was the result of unnecessarily suggestive identification procedures. The following additional facts are pertinent to our analysis of this claim.

## A

### TESTIMONY OF ROBERT TRERICE

At trial, Trerice described the height, build and clothing of the man he had observed at the scene of the fire. In particular, Trerice described the man's hair. At the time he observed the man, it was daylight and Trerice got a good look at the individual's back and side. He did not view the man's face straight on. Trerice observed the man from approximately 120 feet.

As a result of the defendant's motion to suppress identification, the court held a hearing in the absence of the jury at which the following facts came to light. The defendant had been videotaped without his knowledge at the police station the day after the fire while speaking to Lieutenant Joseph Forte. Later that day,

Trerice viewed the videotape and indicated that the man in the tape was very similar to the man he had seen at the house and that the hair of each was identical. He could not, however, make a positive identification.

Trerice offered to testify before the jury as to the similarity between the man he had seen in the videotape and the man he had seen at the scene. The court did not treat this proffered testimony as an identification but distinguished it as "resemblance" testimony. Although the court found that the police had used an unnecessarily suggestive procedure in showing Trerice the videotape, the court admitted Trerice's testimony on the basis that Trerice was not making an identification nor was his testimony leading to an identification of the defendant. The court explicitly prohibited Trerice from making any comparison before the jury between the defendant and what he had seen. The court refused to admit the videotape itself into evidence on the basis that it was unnecessarily suggestive. In the jury's presence, Trerice testified as to the similarities between the man he had seen at the house and the man he had viewed on the videotape, specifically as to hair, age and build. The defendant took an exception. Later in the trial, Forte identified the person on the videotape as the defendant. He indicated that at the time of the taping, the defendant wore blue work pants, dark shoes, a red plaid wool or flannel hip length jacket and a red shirt.

We agree that Trerice's testimony was not identification testimony. Whether resemblance testimony is the same as identification testimony in each case in which there has been an improper identification procedure is an issue of first impression in our state. We note that there is disagreement among the federal courts that have had occasion to pass on this issue. Compare *United States* v. *Brooks,* 449 F.2d 1077 (D.C.

Cir. 1971) with *Patler* v. *Slayton,* 503 F.2d 472 (4th Cir. 1974). In *United States* v. *Brooks,* the District of Columbia Circuit Court of Appeals stated that "[w]hile 'resemblance' testimony projects some uncertainty on the part of the witness, it is part of the evidence which the jury may consider to constitute a basis for a guilty verdict, and a defendant's rights would be violated if such testimony had been obtained by the Government e.g., by an arrantly suggestive confrontation." *United States* v. *Brooks,* supra, 1083. We find the view articulated by the Fourth Circuit in *Patler* v. *Slayton,* supra, to be more compelling, however. In that case the Fourth Circuit held that although the line between resemblance and identification testimony may be thin, it is a "line worth drawing." Id., 476. This view has also been adopted by the Appellate Division of the New York Supreme Court. See *People* v. *Moss,* 172 App. Div. 2d 856, 569 N.Y.S.2d 457, appeal granted, 78 N.Y.2d 1079, 583 N.E.2d 954, 577 N.Y.S.2d 242 (1991); *People* v. *Sanders,* 108 App. Div. 2d 316, 489 N.Y.S.2d 348, aff'd, 66 N.Y.2d 906, 489 N.E.2d 743, 498 N.Y.S.2d 774 (1985).

While we agree with the trial court that Trerice's resemblance testimony was not identification testimony because it neither identified nor led to an identification of the defendant, this determination does not conclude our review. In this case, the police display of the videotape to Trerice was unnecessarily suggestive. See *State* v. *Findlay,* 198 Conn. 328, 338, 502 A.2d 921, cert. denied, 476 U.S. 1159, 106 S. Ct. 2279, 90 L. Ed. 2d 721 (1986). "Although the failure of a witness to make a positive, in-court identification cannot be used by the state to insulate its improper identification procedures from scrutiny, it is entirely possible . . . for a skilled trial judge to separate tainted matter from what the witness actually observed at the scene of the crime and thus avoid an unnecessarily blunt application of the

exclusionary rule . . . ." *Patler* v. *Slayton,* supra. Here, the trial court limited Trerice's testimony to similarities between the man in the videotape and the man Trerice saw at the house. The court prohibited Trerice from making a comparison with the defendant to ensure that the thin line between resemblance and identification testimony was not crossed.[2]

Because Trerice's resemblance testimony was predicated on an impermissibly suggestive procedure, we must establish a standard by which to determine its admissibility. We note that the standard we adopt today need not be employed in all cases involving resemblance testimony, but merely in those cases in which an improper identification procedure has occurred. We choose to adopt a standard identical to that applied to identification testimony that is the product of improper police procedure, the test being whether the testimony was nevertheless reliable based on an examination of the totality of the circumstances. See *State* v. *Theriault,* 182 Conn. 366, 371–72, 438 A.2d 432 (1980).

An in-court identification must be excluded as violative of the defendant's due process rights only if it is the product of an unconstitutional pretrial identification procedure. *State* v. *Tatum,* 219 Conn. 721, 726–27, 595 A.2d 322 (1991). "In determining whether identification procedures violate a defendant's due process rights, the required inquiry is made on an ad hoc basis and is two-pronged: first, it must be determined whether the identification procedure was unnecessarily suggestive; and second, if it is found to have been so, it must be determined whether the identification was nevertheless reliable based on an examination of

---

[2] The trial court's recognition of the thin line between resemblance and identification testimony is evidenced by its distinction between the testimony of Trerice and the testimony of Christine Bosco and John Korab, which was treated as identification testimony.

the 'totality of the circumstances.' " *State* v. *Theriault,* supra; *State* v. *Howard,* 221 Conn. 447, 453, 604 A.2d 1294 (1992).

"To determine whether an identification resulting from an unduly suggestive procedure is nevertheless reliable, [we] must weigh the corrupting effect of the suggestive procedure in light of the following factors: 'the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation.' " *State* v. *Howard,* supra, quoting *Manson* v. *Brathwaite,* 432 U.S. 98, 114, 97 S. Ct. 2243, 53 L. Ed. 2d 140 (1977).

We recognize that "the *Manson* reliability inquiry contemplates a series of factbound determinations, which a trial court is far better equipped than [an appellate court] to make . . . ." *State* v. *Howard,* supra, 454. Because the trial court in this case did not make such findings, the record must be sufficient for us to review that prong of the required constitutional test, See *State* v. *Tatum,* supra, 727 n.11 (the defendant failed to file a motion to suppress regarding a challenged identification procedure); *Williams* v. *Bronson,* 21 Conn. App. 260, 265–66, 573 A.2d 330 (1989) (a habeas corpus proceeding wherein no challenge to the identification was made). We find that the record in this case is sufficient for us to determine whether Trerice's resemblance testimony was reliable.

Although we agree with the trial court's conclusion that Trerice's testimony was not identification testimony, we also conclude that the trial court properly admitted his testimony, as it was reliable. Even though the procedure employed was unnecessarily suggestive, the resemblance testimony satisfies the five factor reliability test enunciated in *Manson* v. *Brathwaite,* supra.

Turning to the facts of this case, we first note that Trerice had a good opportunity to view the man at the scene of the fire. Trerice testified that it was "very light" at the time he made his observations. He testified that he viewed the man from the side for approximately four or five seconds as the man stepped out of the front door and that he got a longer look from the back. Although Trerice viewed the man from a distance of 120 feet, he testified that he has good eyesight and that he got a "good look" at the back of the man through his open car window. Our Supreme Court has stated that "a good hard look will pass muster even if it occurs during a fleeting glance." *State* v. *Ledbetter,* 185 Conn. 607, 615, 441 A.2d 595 (1981). Furthermore, he testified that he was familiar with the area and that he travels on East Street approximately once a week and sometimes more.

Trerice's degree of attention was high during his observation given the fact that there were heavy smoke and flames coming from the back of the house. His degree of attention was further heightened given his position as a lieutenant firefighter in a nearby town. Furthermore, he was struck by the sight of a person exiting a burning building in what he described as a calm, deliberate manner, appearing to take the time to lock the front door.

Trerice was able to provide the police with a description of the length and distinctive color of the man's hair, as well as an approximation of his height, build and age. Trerice also provided the police with a description of the man's clothing.

Although Trerice could not positively identify the defendant, his uncertainty in and of itself does not render the testimony unreliable. "[A]dmissibility of identification testimony requires a judgment about reliability that is derived from a matrix of factors in

which the relative certainty of the identification is only one component." *State* v. *Perez,* 198 Conn. 68, 76, 502 A.2d 368 (1985); *Manson* v. *Brathwaite,* supra, 114. Absent a very substantial likelihood of irreparable misidentification, " '[w]e are content to rely upon the good sense and judgment of American juries, for evidence with some element of untrustworthiness is customary grist for the jury mill. Juries are not so susceptible that they cannot measure intelligently the weight of identification testimony that has some questionable feature.' " *State* v. *Ramsundar,* 204 Conn. 4, 13, 526 A.2d 1311, cert. denied, 484 U.S. 955, 108 S. Ct. 348, 98 L. Ed. 2d 374 (1987), quoting *Manson* v. *Brathwaite,* supra, 116. Any uncertainty on Trerice's part goes toward the weight of the evidence rather than the admissibility. *State* v. *Mayette,* 204 Conn. 571, 584, 529 A.2d 673 (1987). "The weaknesses of identifications can be explored on cross-examination and during counsel's final arguments to the jury." *State* v. *Kemp,* 199 Conn. 473, 478, 507 A.2d 1387 (1986). It was a matter for the jury to determine, after cross-examination, what weight to accord Trerice's testimony.

Finally, Trerice gave his description of the man to the police only one day after he had made his observation at the scene. This factor strongly supports the reliability of the resemblance testimony. See *State* v. *Cubano,* 203 Conn. 81, 96, 523 A.2d 495 (1987) (*only* nine days between the crime and the identification); *State* v. *Arroyo,* 13 Conn. App. 687, 690, 539 A.2d 581, cert. denied, 208 A.2d 805, 545 A.2d 1103 (1988) (*only* eighteen days between the crime and the identification). Trerice's testimony as to what he saw at the scene was, therefore, not tainted by the unnecessarily suggestive display of the videotape. We conclude that despite any impermissibly suggestive identification procedure used by the police, Trerice's resemblance testimony was nevertheless reliable. Thus, the court properly admit-

ted Trerice's resemblance testimony as circumstantial evidence, leaving the jury to determine what weight it should be accorded.

## B

### TESTIMONY OF CHRISTINE BOSCO

We next examine the admissibility of the testimony of Christine Bosco, an attendant at Norm's A-1 Citgo station in Wolcott. The day after the fire, the police canvassed area gasoline station attendants about people who purchased gas in containers on the previous day. Bosco testified in the presence of the jury that she transacted three such sales. Specifically, she sold gas pumped into a container to an older man who was driving a van or small truck. She described the man whom she saw face-to-face as being of medium height, a little bit stocky and with salt and pepper hair, wearing a red plaid "kind of shirt-jacket." She testified that the man, who was about forty-five or fifty years old, pumped gasoline into a five gallon container and paid her. This transaction occurred sometime between 5 and 7 p.m.

The next day, Officer Brian Morrone of the Wolcott police department showed Bosco a photograph of five people including the defendant. Bosco pointed out the defendant and indicated that he resembled the man who had purchased gas in a container from her the previous day. She testified that the build, size, age, and especially the hair of the man in the photograph resembled the person who had purchased the gas. She testified that there was a "general resemblance" between the two. She characterized the resemblance as "very close." She also testified that she viewed a videotape at the police station and that the man in the tape "very much resembled" the man who had purchased gas the previous day and also resembled the person in the photograph. She testified that she was absolutely certain

that the man's jacket in the tape was the same as that worn by the customer who had purchased the gasoline. She then pointed out the defendant, who was seated at counsel table, as a man who "closely resembles" the man who purchased gas from her on April 20.

The trial court treated Bosco's testimony as identification testimony. Although the court found that the procedures used by the police were unnecessarily suggestive, the court held that her identification, to the extent that she could make one, was nonetheless reliable.

As discussed earlier, when a witness has made a pretrial identification, the analysis of whether the witness should be permitted to identify the defendant at trial requires a two step inquiry. *State* v. *Howard,* supra, 453. The first question is whether the pretrial identification procedures were unduly suggestive of the suspect's guilt. *State* v. *Milner,* 206 Conn. 512, 534, 539 A.2d 80 (1988). If so, the second inquiry is whether the identification was nevertheless reliable based on an examination of the totality of the circumstances. Id. " 'Reliability is the linchpin in determining the admissibility of identification evidence.' " *State* v. *Chapman,* 16 Conn. App. 38, 43, 546 A.2d 929, cert. denied, 209 Conn. 827, 552 A.2d 433 (1988), quoting *Manson* v. *Brathwaite,* supra, 114. Although Bosco did not witness the actual crime, the five factor test enunciated in *Manson* can still be applied to the facts of this case to determine reliability. *State* v. *Ramsundar,* supra, 11. "We must examine the circumstances that did exist and determine on the whole whether any suggestiveness in the identification procedure created a very substantial risk of misidentification." Id.

Because the analysis of reliability under *Manson* v. *Brathwaite,* supra, rests on a series of factual determinations that are normally within the province of the

trial court, we will not dismiss the factual findings of the trial court unless there is "clear and manifest error." *State* v. *Howard,* supra, 454. After careful examination of the record with an eye toward the constitutional rights of the accused; see id; we conclude that the facts found by the trial court are adequately supported by the evidence. Although the police in this case used an impermissibly suggestive identification procedure, we agree with the trial court that, under the totality of the circumstances, Bosco's identification of the defendant was nevertheless reliable.

Bosco had a very good opportunity to view the customer who purchased gas in a container from her and who she testified resembled the defendant. The customer came into the store sometime between 5 and 7 p.m. while it was daylight. Bosco testified that she generally paid particular attention to customers who pumped gas into containers because those customers do not pay for their gas until after it has been pumped. Bosco was able to recall the man's height, build, clothing and especially his hair. Bosco emphasized that she was "absolutely certain" that the customer was wearing the same jacket that the defendant wore in the videotape she viewed. In addition, only one day had passed between her encounter with the customer and her description of the man to the police.

The fact that Bosco was not absolutely certain that the defendant was the man she saw in the store did not render her testimony unreliable. Again, any uncertainty on her part goes to the weight of the evidence rather than its admissibility and thus was a matter for the jury to decide. *State* v. *Mayette,* supra. In this case, the trial court could have reasonably found that any suggestiveness in the identification procedure did not result in a substantial likelihood of misidentification and that Bosco's identification of the defendant was sufficiently reliable to be submitted to the jury.

## C

### TESTIMONY OF JOHN KORAB

We next turn to the admissibility of the testimony of John Korab, an attendant at the Getty Mart in Wolcott. He testified that a man bought gas in a container from him on April 20, 1989. The day after the fire, the police showed Korab the same photograph shown to Bosco. Korab pointed out the defendant and said, "That's the man, unless he's got a twin." At trial, Korab testified that the customer came in between 4 and 5 p.m., paid Korab for the gas in advance, went to the pump farthest from the building and pumped $1 or $2 worth of gas into a plastic container that did not say "gasoline" on it. Korab testified that he was uneasy because an attendant is not supposed to let a customer pump gas into a container that does not say "gasoline" on it. Korab also viewed the tape shown to Bosco and Trerice. He testified that the man in the tape was the same man who had bought gas in a plastic container from him. The man in the tape had the same face and hair as the customer, but his body appeared bigger than the customer's. Korab testified that the customer was between 5 feet 6 inches and 5 feet 8 inches tall, with a medium build and in his late thirties and was wearing "something like a gray tweed jacket."

The court treated Korab's testimony as identification testimony. Although the court found that the identification procedures used by the police were unnecessarily suggestive, it found that the testimony was nonetheless reliable under the totality of the circumstances test. Although Korab's out-of-court identification did not identify the defendant outright, he told the police, "That's the man, unless he's got a twin." This testimony is clearly identification testimony.

When analyzed under the totality of the circumstances test as enunciated in *Manson* v. *Brathwaite,* supra, Korab's testimony is reliable. Korab had a good opportunity to view the face of the customer alleged to be the defendant. The customer came into his store between 4 and 5 p.m. while it was daylight, and Korab saw him face to face. Korab's degree of attention was high due to his uneasiness because the customer pumped gas into an improper container. Only one day passed between Korab's transaction with the customer and his description of him to the police.

Any discrepancy in Korab's testimony between the size and age of the customer and the defendant's size and age goes toward the weight of the evidence rather than its admissibility. *State* v. *Williamson,* 206 Conn. 685, 694, 539 A.2d 561 (1988). Thus, we conclude that the trial court reasonably could have found that Korab's testimony was reliable on the basis of the totality of the circumstances, despite any impermissibly suggestive identification procedure that occurred.

## II

The defendant next claims that the trial court improperly instructed the jury that an adverse inference could be drawn against the defendant from his failure to call a certain witness.

Although the defendant was convicted as a principal to the crime of arson in the second degree, he had also been charged with arson in the first degree and being an accessory to arson in both the first and second degrees. The court permitted the accessory charges to go to the jury because evidence had been presented that an automobile matching one owned by the defendant's son had been observed at or near the fire and that this automobile had been driven away from the scene in a manner similar to the way the defendant's son drove.

The defendant's son, Ralph Lago, Jr., testifying for the defense, indicated that he worked in Farmington until approximately 5 p.m. on the day of the fire. He then went to a package store and a softball game. Shortly after 7 p.m., he went to the Southington home of a coworker, Greg Prislow, arriving at approximately 7:45 p.m. Prislow's house is only a short distance from East Street in Wolcott. Ralph Lago, Jr., left Prislow's at 10 or 10:30 p.m. and arrived at his house at 11 p.m. During closing arguments, the state asserted that the evidence suggested that the defendant and his son were at the Lago house at the time the fire was set. The state pointed out that despite evidence implicating Ralph Lago, Jr., in the crime, Prislow was never called to support his testimony that he was at Prislow's house at the time of the fire.

The state filed a request to charge the jury with a missing witness instruction, a *Secondino* charge.[3] The defendant did not object, and, therefore, the state argues that this claim is not properly preserved. *State v. Anderson,* 212 Conn. 31, 561 A.2d 897 (1989). We note that the court file indicates that the state's request was granted on November 13 and that the charge was given on November 15. There was no argument or advance ruling noted in open court. An advance ruling was filed by the court prior to the commencement of oral arguments. Oral arguments began on November 13. When the court gave the requested *Secondino* instruction on November 15, the defendant noted his exception. We therefore conclude that this case is unlike *State v. Anderson,* supra, where the trial court expressed its intent to grant the state's motion in response to a

[3] " 'The failure of a party to produce a witness who is within his power to produce and who would naturally have been produced by him, permits the inference that the evidence of the witness would be unfavorable to the party's cause.' " *Secondino* v. *New Haven Gas Co.,* 147 Conn. 672, 675, 165 A.2d 598 (1960).

request made prior to the commencement of oral argument and the defendant did not object. Here, the court granted the state's request, and the defendant was aware of that action prior to oral arguments and the defendant failed to object. Our Supreme Court has indicated that "[a]lthough the defendant objected to the court's instructions during the state's final argument and after the *Secondino* charge was given to the jury, objection to such an instruction should have been made by the defendant *when he learned that the state had requested it and prior to its being brought up in arguments.*" (Emphasis added.) *State* v. *Anderson*, supra, 43.

As in *Anderson*, the state here followed the proper procedure in requesting a *Secondino* charge. The state intended to argue to the jury that an unfavorable inference could be drawn from the absence of a witness, and, therefore, obtained an advance ruling from the court by its request to charge, a copy of which was given to the defendant. While the state did not, as in *Anderson*, orally ask the court for a ruling on the requested *Secondino* charge, such was not required because the court granted that request prior to oral arguments. It would serve no purpose for the state to request something that had already been granted. "[I]t was incumbent on the defendant to interpose a proper objection *before* the issue of the missing [witness] was brought to the attention of the jury." (Emphasis added.) *State* v. *Anderson*, supra. The defendant's claim was not properly preserved. "A party who fails to make a timely objection to the giving of a *Secondino* charge will be deemed to have waived the issue for appeal. The giving of a *Secondino* charge is purely an evidentiary issue and is not a matter of constitutional dimensions." Id., 41–42.

Even if we were to reach the merits of this question, we are not persuaded that the trial court committed plain error in giving a *Secondino* charge, and even if

error was committed, it was harmless because the jury convicted the defendant as a principal rather than an accessory. Any adverse inference from Prislow's absence played a minimal role at most in the jury's deliberations. The defendant has failed to meet his burden of demonstrating that the charge was likely to have affected the verdict. *State* v. *Shashaty,* 205 Conn. 39, 44, 529 A.2d 1308 (1987), cert. denied, 484 U.S. 1027, 108 S. Ct. 753, 98 L. Ed. 2d 766 (1988).

## III

Finally, the defendant claims that the evidence produced by the state was insufficient to sustain a conviction for insurance fraud in violation of General Statutes § 53a-215. Specifically, the defendant claims that the state failed to prove that (1) there was a claim for payment within the meaning of the statute, and (2) the Lladro figurines, which the defendant alleges were destroyed in the fire, had in fact been taken from the house.

The jury reasonably could have found the following facts relevant to this claim. Both the defendant and Diana Lago submitted claims to the Aetna Insurance Company for losses incurred in the fire. Gloria Woodwell, a senior claims adjustor for the Aetna Insurance Company, examined the remains of the house a number of times after the fire to determine the overall damage and the contents of the home, as well as to discover any salvageable items. She went through the rubble of the entire house, measured each room starting with the basement, and looked in every section. Although she discovered stoneware in the remnants of the upstairs back bedroom, she saw no traces of the Lladro figurines at the scene. She was aware that Lladro figurines are made of porcelain and have a higher melting point than stoneware. During her inspections,

Woodwell knew of the defendant's claim that Lladro figurines had been lost in the fire. The estimated value of the figurines ranged from $100 to $15,000.

Aetna's claims procedures allow anyone filing a claim to submit a written list of what was lost on forms provided by the company. As part of this procedure Aetna requires that claims be accompanied by receipts, canceled checks, or other documentation to prove the amount of the loss. On June 14, 1989, the defendant submitted a signed contents claim worksheet, as required by Aetna, which contained a list of Lladro figurines. This claim sheet is kept by Aetna as a permanent record of a claim made on the policy. The defendant also provided Aetna with over eighty photographs of items he owned that he claimed were destroyed in the fire, including the Lladro figurines. A sworn statement of the defendant's proof of loss was also submitted. Additionally, attached to the seventeen pages of the contents worksheets was an oath page that stated that they were true and accurate to the best of the defendant's knowledge. There were many conversations between the defendant and Woodwell wherein the defendant expressed his interest in settling his claim.

The defendant's Lladro collection had been kept in his room at 48 East Street prior to his moving out. Brian Haylette, a former boyfriend of the defendant's daughter, testified that sometime in late 1988, he assisted the defendant and the defendant's daughter, Therese Collela, in removing certain items from the defendant's room at the house at 48 East Street. He testified that, among other things, they moved Lladro figurines to the defendant's parents' house in Waterbury. Collela testified, however, that the figurines had not been moved from the house but had been stored in the attic. Diana Lago testified that as of March 22, 1989, all items belonging to the defendant had been

removed from his room. The room was bare, without light fixtures, telephone jacks or closet doors. Collela later told her mother that she had removed the figurines, and the defendant himself admitted removing some figurines from the house. The photographs of the Lladro figurines submitted to Aetna by the defendant were not taken at 48 East Street. They were taken sometime between December 1, 1988, and the day of the fire, and included figurines that had never been at 48 East Street, and belonged to Collela and the defendant's mother.

When reviewing a sufficiency of the evidence claim, we first examine the evidence in the light most favorable to upholding the jury's verdict. *State* v. *Avis*, 209 Conn. 290, 309, 551 A.2d 26 (1988), cert. denied, 489 U.S. 1097, 109 S. Ct. 1570, 103 L. Ed. 2d 937 (1989); *State* v. *Rice*, 25 Conn. App. 646, 650, 595 A.2d 947 (1991). We then determine on the basis of the facts established and the inferences that reasonably could be drawn from those facts whether the jury reasonably could have concluded that the cumulative effect of the evidence established the defendant's guilt beyond a reasonable doubt. *State* v. *Famiglietti*, 219 Conn. 605, 609, 595 A.2d 306 (1991); *State* v. *Hopes*, 26 Conn. App. 367, 376, 602 A.2d 23, cert. denied, 221 Conn. 915, 603 A.2d 405 (1992). We note that the probative force of the evidence is not diminished because it consists, in whole or in part, of circumstantial evidence rather than direct evidence. *State* v. *Robinson*, 213 Conn. 243, 254, 567 A.2d 1173 (1989).

The defendant first alleges that there was no evidence of a demand or claim for any monetary amount and, therefore, the requirements of General Statutes § 53a-215 were not met. This claim is without merit. Neither the statute nor Aetna requires that a claim be filed for a specified monetary amount. Aetna merely seeks information known to the claimant relative to the

original cost, the cost to replace, clean or repair the items. The term "claim for payment or other benefit" as contained in § 53a-215 is followed by the words "pursuant to such policy of insurance." Thus, the claim for payment is dependent on the procedures of the insurer to establish a payment for a claimed loss. A claimant who knowingly supplies false statements as part of or in support of a claim for payment violates this statute and is guilty of insurance fraud, even absent an actual demand or claim for a specific monetary amount.

The defendant also claims that the evidence submitted to the jury was insufficient to sustain his conviction because it failed to establish that the Lladro figurines had been taken from the house before the fire. While there was contradictory evidence introduced at trial concerning the location and alleged removal of the figurines, it is within the province of the jury to determine credibility and assess weight to be given the evidence submitted. *State* v. *Reyes,* 19 Conn. App. 179, 191, 562 A.2d 27 (1989). " '[W]hen the conclusion is one that is dependent on the resolution of conflicting testimony, it should ordinarily be left to the jury for its judgment. *State* v. *Torello,* 100 Conn. 637, 647–48, 124 A. 375 (1924).' " *State* v. *Bewry,* 26 Conn. App. 242, 246, 600 A.2d 787 (1991), cert. denied, 221 Conn. 911, 602 A.2d 11 (1992). The evaluation of testimony is the sole province of the trier of fact. *State* v. *Johnson,* 26 Conn. App. 553, 557, 603 A.2d 406 (1992). The verdict indicates that the jury chose to credit the testimony of Woodwell, Haylette, and Diana Lago, and reject the contradictory testimony of Collela.

The defendant asserts that Woodwell's testimony that she found no evidence of porcelain during her survey deserves little weight because she "did not see an attic or ceiling above the second floor" and the attic is where the defendant claims the figurines were stored. Again, the jury had before it all of the evidence and

chose not to believe that the Lladro figurines were in the attic and had been destroyed. The record shows that Woodwell had examined the entire upstairs, consisting of two bedrooms and storage areas, and a bathroom. The record further indicates that as a result of the fire she could see directly to the roof from the second floor, and that there was no attic separate and distinct from this area. What once was an attic had been converted into two bedrooms, the bathroom and walkway or storage area off the stairs. Further, as a result of the fire, there was no ceiling between the second floor and the roof because the ceiling had burned and fallen. When Woodwell stood on the second floor of the Lago residence, she looked up directly at the roof. Thus, the defendant's claim that Woodwell never went into the attic and, therefore, may have missed the remnants of the Lladro figurines, is without merit.

After a review of the record, we conclude that there was legally sufficient evidence presented at trial for the jury to find the defendant guilty of insurance fraud.

The judgment is affirmed.

In this opinion LAVERY, J., concurred.

FREEDMAN, J., concurring. While I agree with the result reached by the majority, I fail to see the logic in engaging in a discussion of the distinction between resemblance testimony and identification testimony in this case when the majority concludes, as it does, that the standard for determining the admissibility of both types of testimony, when an unnecessarily suggestive procedure is involved, is exactly the same.

If a distinction between resemblance and identification testimony is a distinction worth making, there must be some reason for it. The United States Court of Appeals for the Fourth Circuit, in one of the cases relied on by the majority, recognized the reason for the distinction when it said: "Aside from police deterrence,

the spirit of [the exclusionary rule] is to prevent the conviction of those who may be innocent when a susceptible witness is unfairly allowed to conclude, 'he is the guilty one.' It is far less dangerous to admit testimony, as was done here, that the malefactor was 'dark haired' and 'had a brown coat on' and 'looked something like [the defendant],' which was the gist of [the witness'] testimony." *Patler* v. *Slayton,* 503 F.2d 472, 476–77 (4th Cir. 1974). In other words, because resemblance testimony is potentially less damaging to a defendant than identification testimony, since it is not as likely to lead to a conviction, there is less reason to suppress resemblance testimony, even though an unnecessarily suggestive procedure may have been involved.

Given this reason for the distinction between resemblance and identification testimony, it does not logically follow, as the majority in this case has concluded, that the test for determining the admissibility of resemblance testimony when an unnecessarily suggestive procedure is involved is identical to the test used to determine the admissibility of identification testimony derived from the same unnecessarily suggestive procedure. I would suggest that its admissibility might hinge on some lesser showing of reliability than that required for identification testimony, leaving to the jury the weight to be afforded such testimony if admitted into evidence.

It is not necessary, however, in this case to reach the issue of what such lesser threshold might be for the admissibility of resemblance testimony in conjunction with an unnecessarily suggestive procedure. I would conclude that because Robert Trerice's testimony satisfies the stricter scrutiny of the test used for identification testimony, the trial court properly admitted his testimony into evidence in this case.

With the exception stated above, I agree with all other aspects of the majority opinion.